IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| BENJAMIN FREEDLAND | : | No. 15-175-1 |

MEMORANDUM

PRATTER, J.                                                                                                                           AUGUST 20th, 2020

Benjamin Freedland moves for a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A)(i), claiming that he suffers from multiple health conditions that place him at a high risk of severe illness in the wake of COVID-19. He seeks release from BOP facility USP Yazoo City.[1] The Government responds that extraordinary and compelling reasons do not exist to reduce Mr. Freedland's sentence.

For the reasons that follow, the Court denies the motion.

BACKGROUND

I.     Mr. Freedland's Criminal Conduct

Mr. Freedland was accused of selling medical-grade marijuana to a Philadelphia-based drug trafficking organization and, after receiving an incorrect payment, threatening a woman in an attempt to get the money he was owed. He was also accused of setting up an armed robbery of a marijuana dealer. Mr. Freedland pleaded guilty to two counts: (1) conspiracy to distribute 100 kilograms or more of marijuana; and (2) possession of a firearm in furtherance of a drug trafficking crime and aiding and abetting. He was sentenced to 60 months' imprisonment on Count One and

---

[1]     At the time that Mr. Freedland filed his motion for a reduction of sentence, he was in the process of being transferred from FCI Butner to USP Yazoo and was in holdover status at the Federal Transfer Center in Oklahoma City, Oklahoma. Mr. Freedland's transfer has since been completed.

1

24 months' imprisonment on Count Two, with the terms to run consecutively for a total of 84 months' imprisonment. Mr. Freedland's projected release date is December 13, 2021.

## II. Mr. Freedland's Medical Records

Mr. Freedland's medical records from the BOP reflect that on April 17, 2020, Mr. Freedland had a medical encounter during which he reported a history of childhood asthma, stated that he last used an inhaler approximately six years ago, and requested an inhaler because he feels he needs one at night. He denied any current shortness of breath, dyspnea, wheezing, or cough. The medical provider prescribed Mr. Freedland an albuterol inhaler.

The medical records also reflect that Mr. Freedland has some abnormalities of breathing, specifically shortness of breath at night. In 2019, Mr. Freedland was shown to have mild irregularity of the anterior nasal spine and a mild septal deviation. Surgery has been recommended but not yet performed.

Mr. Freedland has a medical history of cardiac arrhythmia. He has also had two documented methicillin-resistant staphylococcus aureus ("MRSA") infections, the most recent of which resolved in 2016. In addition, Mr. Freedland is allergic to the influenza vaccine.

Mr. Freedland had a psychiatric evaluation performed via telehealth as recently as June 24, 2020. He has a history of psychiatric illnesses including, but not limited to, bipolar disorder, post-traumatic stress disorder, borderline personality disorder, and anxiety and depressive disorders. He is prescribed various medications for the management of these disorders.

## III. BOP's Response to the COVID-19 Pandemic

Because "maintaining safety and security of [BOP] institutions is [BOP's] highest priority,"[2] BOP has taken significant measures to protect the health of the inmates in its charge.

---

[2] BOP, *Updates to BOP COVID-19 Action Plan: Inmate Movement* (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited August 17, 2020).

BOP's Pandemic Influenza Plan has been in place since 2012. BOP HEALTH SERVICES DIVISION, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited August 17, 2020). The protocol set forth in this plan established a multi-phase framework which requires BOP facilities to begin preparations in the face of a "[s]uspected human outbreak overseas." *Id.* at i. This plan further addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

BOP began planning for potential transmissions related to COVID-19 as early as January, during the same time in which it established a working group to develop COVID-19 policies. In accordance with the Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmissions. Now in Phase Seven of the Action Plan, every BOP institution requires all inmates to be secured in their assigned cells/quarters. Limited group gathering, with social distancing to the extent possible, is permitted to facilitate commissary, laundry, showers, telephone, and computer access. BOP is working to distribute face masks to all staff and inmates and encourages face coverings be worn in public spaces when social distancing is not feasible. Excluding medical treatment and similar exigencies, BOP has substantially limited the movement of inmates and detainees among its facilities. Official staff travel has also been cancelled, as has most staff training.

Newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the Centers for Disease Control and Prevention's (CDC) criteria for release from isolation. All facility staff are screened for symptoms in areas with

sustained community transmission. Staff exhibiting a fever of higher than 100.4 degrees Fahrenheit are barred from entering the facility. Similarly, staff members exhibiting a stuffy or runny nose can be placed on leave. Only contractors performing essential services or the necessary maintenance on essential systems may access BOP facilities. Moreover, all volunteer visits have been suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer accessing BOP facilities will accordingly be screened for symptoms and risk factors. As of March 13, 2020, social and legal visits were suspended, with facilities permitting only case-by-case accommodations for visiting attorneys after the attorney has been screened for infection. BOP has increased telephone minute allowances to counteract these limits on in-person interactions.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[3] Pursuant to the Coronavirus Aid, Relief, and Economic Security Act, BOP may also "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). BOP has transferred more than 7,000 inmates to home confinement since March 26, 2020.

Unfortunately, some inmates and staff at various institutions have become ill. As of July 20, 2020, the date the Government filed its response in opposition, 21 of the 789 inmates at USP Yazoo had currently tested positive for COVID-19. One inmate had previously passed away from the disease, and 52 inmates had already recovered.

---

[3] This authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

## LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007). A defendant can move to reduce his or her term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). In order to do so, the defendant must first request that the BOP file a motion on his or her behalf, which can only occur after he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A).[4]

In the event the moving defendant complies with the exhaustion requirement, a court may reduce his or her term of imprisonment if it finds that extraordinary and compelling reasons warrant such a reduction and that the reduction is consistent with the Sentencing Commission's applicable policy statements[5] and only after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable. Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is not a danger to the safety of any person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13.2.

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which

---

[4]  The Government does not raise an exhaustion argument in its opposition.

[5]  Despite § 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," this Court recently concluded that "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, No. 03-271, ___ F. Supp. 3d ___, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1, 2020). Therefore, although the policy statement undoubtedly provides helpful guidance, it also "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at *4.

provides guidance for defining the term. The application note provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). To find compelling and extraordinary reasons, the policy statement additionally requires a court to find that a defendant is "not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

A court considers multiple factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The defendant bears the burden of showing that a reduction in sentence is proper. *United States v. Rengifo*, No. 13-131, 2020 WL 4206146, at *2 (M.D. Pa. July 22, 2020) (citing *United States v. Jones*, 836 F.3d 896, 899) (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014)).

### DISCUSSION

Mr. Freedland moves to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A)(i). He claims to have a significant medical history that could put him at higher risk of serious injury or death if he were to contract COVID-19. He cites a history of asthma, left ventricular hypertrophy, MRSA, abnormal breathing difficulties related to a previous nasal fracture and deviated septum, and prior paralysis from receiving the influenza vaccine. He also asserts that he has had no access to

psychiatric care despite suffering from multiple psychiatric disorders and being on a psychiatric medication regimen.[6] Mr. Freedland argues that he only has 18 months of his 84-month sentence remaining and that he has demonstrated his rehabilitation by participating in a number of programs, instructing an adult continuing education course, tutoring GED students, obtaining his certification as a personal trainer, instructing two recreation programs in cardiovascular fitness, and re-introducing a Narcotics Anonymous Program at a prior facility.

Before addressing the arguments and the evidence, it bears recognizing the unprecedented magnitude of the COVID-19 pandemic. Indeed, to the extent correctional facilities may have successfully dealt with past viruses and outbreaks of communicable diseases, those diseases pale in scope with the apparent magnitude and speed of transmission of COVID-19 and the challenges associated with it. This virus comes in the form of a world-wide pandemic, resulting in a declaration of a national emergency and states of emergency by many states, along with various forms of business closures or modifications to operations and stay-at-home orders. Without known effective treatment at this time, and vaccines months (or more) away, public health officials urge people to practice "social distancing,"[7] frequent and thorough hand-washing, avoidance of close contact with others, and wearing masks during public interactions—all of which are understandably difficult to implement in a correctional or detention facility. Certainly, the Court takes this critical health risk seriously. But as concerning as the common calamity of COVID-19

---

[6] Mr. Freedland also raised a series of arguments related to the conditions at the Federal Transfer Center and purported failures of the staff to adhere to COVID-19 safeguards and precautions. Because Mr. Freedland is no longer at the Federal Transfer Center, these arguments are moot. Mr. Freedland has not raised any COVID-19-related arguments specific to the conditions at USP Yazoo.

[7] Some have understandably suggested that this would be better thought of as "physical distancing," insofar as it is also strongly urged that maintenance of social interaction remains important for purposes of counteracting the negative emotional aspects of isolation.

is, resolving Mr. Freedland's motion still calls upon the Court to seriously take into consideration the limits imposed pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

Turning to Mr. Freedland's arguments, the Court concludes that his circumstances do not present extraordinary and compelling reasons to reduce his sentence.

### I. Asthma

The CDC has released a list of conditions that place an individual at an increased risk of severe illness from COVID-19. *See* CDC, *People with Certain Medical Conditions*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited August 17, 2020). Asthma is not one of these conditions. Rather, the CDC advises only that moderate to severe asthma *may* increase the risk associated with COVID-19. *See* CDC, *People with Moderate to Severe Asthma*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last visited August 17, 2020).

Pursuant to the National Asthma Education and Prevention Program, an individual suffers from moderate persistent asthma if any of the following is true:

- Symptoms occur daily. Inhaled short-acting asthma medication is used every day.
- Symptoms interfere with daily activities.
- Nighttime symptoms occur more than 1 time a week, but do not happen every day.
- Lung function tests are abnormal (more than 60% to less than 80% of the expected value), and PEF [peak expiratory flow] varies more than 30% from morning to afternoon.

UNIVERSITY OF MICHIGAN, *Classification of Asthma*, available at https://www.uofmhealth.org/health-library/hw161158 (last visited August 17, 2020).

Mr. Freedland's medical records suggest that he may satisfy at least one of these conditions. However, the medical records also depict a fit and active lifestyle—as of 2019, Mr.

Freedland played various sports including softball, soccer, and handball; he described himself as deeply committed to his health; and he stated he exercises routinely. He became certified as a personal trainer in 2018 and instructed two three-month inmate recreation programs in cardiovascular fitness. Mr. Freedland has maintained this active lifestyle with no asthma-related complaints and with no prescribed inhaler until April 2020, after lockdowns related to COVID-19 had been implemented across the country. And once Mr. Freedland did request an inhaler at a medical encounter, he stated he only felt he needed the inhaler at night, and he denied any current shortness of breath, wheezing, or cough.

The record does not support a finding that Mr. Freedland's asthma, even in the wake of the COVID-19 pandemic, has substantially diminished his ability to provide self-care in a correctional facility. Indeed, Mr. Freedland's medical records depict quite the opposite: an active 37-year-old who prioritizes a dynamic lifestyle and whose asthma is well managed. In light of the CDC's recommendation that asthma may only possibly increase a person's risk of severe illness from COVID-19 and Mr. Freedland's active lifestyle and general lack of asthma-related life impairments, the Court concludes that Mr. Freedland's asthma does not present an extraordinary and compelling reason to reduce his sentence. *See United States v. Pomales*, No. 16-826, 2020 WL 4677596, at *2 (S.D.N.Y. Aug. 12, 2020) (concluding that asthma did not constitute an extraordinary and compelling reason to reduce defendant's sentence because "the evidence on this question is 'mixed,' meaning that 'multiple studies . . . reached different conclusions about risk associated' with asthma," and the defendant "has generally been able to manage his condition with his inhaler and other preventative measures [] and he has never been hospitalized or intubated on account of his asthma") (quoting CDC, *Evidence Used to Update the List of Underlying Medical Conditions that Increase a Person's Risk of Severe Illness from COVID-19,*

9

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html (last visited August 17, 2020)).

## II. Left Ventricular Hypertrophy

Mr. Freedland also claims to be at an increased risk from COVID-19 due to his history of left ventricular hypertrophy. Although Mr. Freedland's medical records do not explicitly reference "left ventricular hypertrophy," they do reflect that he has a cardiac arrhythmia, which he claims was described to him as left ventricular hypertrophy.

The CDC advises that "serious heart conditions," specifically heart failure, coronary artery disease, cardiomyopathies, and pulmonary hypertension, increase the risk of severe illness from COVID-19. *See* CDC, *Serious Heart Conditions and Other Cardiovascular and Cerebrovascular Diseases*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited August 17, 2020). Neither arrhythmia nor ventricular hypertrophy falls into one of these categories. Although the CDC recognizes that "[h]aving other cardiovascular or cerebrovascular disease . . . may increase [the] risk of severe illness from COVID-19," *id.*, such other cardiovascular diseases are not considered high risk. Mr. Freedland's left ventricular hypertrophy does not constitute an extraordinary and compelling circumstance.

## III. History of MRSA

Mr. Freedland has had two MRSA infections in the past and argues that MRSA can resist the effects of many common antibiotics, making MRSA infections more difficult to treat and allowing the infection to sometimes spread and become life-threatening. He also claims that MRSA can affect the heart and lungs, and that outbreaks can occur in crowded or unsanitary conditions, such as in prisons and jails. Mr. Freedland admits that his last MRSA infection was

10

resolved in 2016 but argues that he is highly susceptible to contracting MRSA in the future due to his prior to infections.

The CDC has not recognized having a current MRSA infection or having a history of MRSA infections as a risk factor for COVID-19. Mr. Freedland has not suffered from MRSA since 2016. Based on the CDC's guidelines and the lack of evidence that MRSA currently places Mr. Freedland at any increased risk of illness, granting relief on a MRSA-related basis would be wholly speculative in nature.

### IV. Abnormal Breathing

Mr. Freedland next states that in addition to asthma, he has "other breathing abnormalities" related to a fractured nose in 2009. Mot. to Reduce Sentence 4 (Doc. No. 32). After being struck by a softball in 2019, an x-ray was performed and it was determined that Mr. Freedland suffers from a deviated septum. Surgery, specifically a functional septorhinoplasty and turbinectomy, has been recommended but not yet performed. Mr. Freedland claims that because of his nasal conditions, he has shortness of breath and wakes up at night gasping for air.

Mr. Freedland does not explain how these breathing abnormalities place him at a higher risk of severe illness from COVID-19. COPD, including emphysema and chronic bronchitis, is known to increase the risk of severe illness from COVID-19, and other chronic lung diseases, such as idiopathic pulmonary fibrosis and cystic fibrosis, may increase the risk. *See* CDC, *COPD, Cystic Fibrosis, Pulmonary Fibrosis, and Other Chronic Lung Diseases*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#copd (last visited August 17, 2020). However, general breathing abnormalities are only referenced as a symptom of COVID-19 and are not listed as a risk factor. Although Mr. Freedland states that the Government's description of his breathing abnormalities as mere nasal

11

"congestion" is egregious and untrue, he fails to explain why that is or how his breathing abnormalities place him at an increased risk of severe illness from COVID-19. Accordingly, this condition does not constitute an extraordinary or compelling reason supporting release.

### V. Prior Paralysis Related to the Influenza Vaccine

Having suffered prior paralysis from the influenza vaccine, Mr. Freedland is considered allergic to the influence vaccine and is not currently immunized. He states that this allergy makes him more susceptible to the seasonal flu, which he claims would be dangerous if he were to also contract COVID-19. He adds that it is also unlikely that he will be a candidate for COVID-19 immunization.

Like Mr. Freedland's concerns related to MRSA, his arguments related to his influenza vaccine allergy are too speculative to entitle him to relief. In the absence of any evidence presented in support of Mr. Freedland's vaccine candidacy arguments, the Court cannot say how Mr. Freedland's prior paralysis may impact his candidacy for a future COVID-19 vaccine. Nor does the unlikely possibility of Mr. Freedland contracting both the seasonal flu and COVID-19 at the same time at some unknown point in the future constitute a compelling circumstance entitling him to relief. Although the Court stresses the importance of the influenza vaccine, particularly during times such as these, the influenza vaccine has an estimated effectiveness of only 40%–60%. *See* CDC, *Interim Flu Vaccine Effectiveness Estimates for the 2019–2020 Flue Season*, available at https://www.cdc.gov/flu/spotlights/2019-2020/interim-flu-vaccine-effectiveness.htm (last visited August 17, 2020). Therefore, even if Mr. Freedland were able to receive the influenza vaccine, he would still face a possibility of contracting the seasonal flu, a possibility that all inmates face. Accordingly, Mr. Freedland's prior paralysis due to the influenza vaccine is not an extraordinary or compelling circumstance.

### VI. Psychiatric Illness

Mr. Freedland claims to be a care level 2 mental health inmate requiring close supervision to monitor a complex medication regime consisting of four separate psychiatric medications. He argues that his psychiatric condition has been exacerbated by the COVID-19 pandemic in the form of increased depression, racing thoughts, decreased concentration, anxiety, increased melancholy, and trouble sleeping, and he states he is concerned for the health of his immediate family. He represents that, as of the date of his reply filed on July 31, 2020, he has not been seen by psychology services since being transferred to USP Yazoo on July 10, 2020.

The Court underscores the important role that mental health services play in providing appropriate and necessary care to inmates. However, Mr. Freedland's motion focused on his lack of access to mental health treatment at the Federal Transfer Center in Oklahoma City. Because Mr. Freedland's transfer has since been completed and he is no longer housed at the Federal Transfer Center, those arguments are now moot. And although the Court is disappointed to hear that Mr. Freedland had not yet been seen by psychology services at USP Yazoo as of July 31, 2020, he was only recently transferred there on July 10, 2020. Certain delays must be anticipated during these unprecedented times, particularly when newly transferred inmates are often subjected to necessary quarantines and certain degrees of isolation.

At this time, there is nothing in the record from which the Court could conclude that the staff at USP Yazoo have been deliberately indifferent to Mr. Freedland's medical needs. Nor has adequate evidence or argument been presented demonstrating that Mr. Freedland's delay in being seen by psychology services at USP Yazoo has resulted in Mr. Freedman's inability to provide self-care. Furthermore, the CDC has not identified any of Mr. Freedland's mental health conditions as increasing the risk of serious illness from COVID-19. *See United States v. Wragg*,

No. 15-398, 2020 WL 4015204, at *8 (E.D. Pa. July 16, 2020) (holding that defendant's medical conditions "are not severe enough to warrant release" where defendant claimed to suffer from epilepsy, non-pulmonary hypertension, hyperlipidemia, mild obesity, and mental health issues); *United States v. James*, No. 15-00255, 2020 WL 3567835, at *4 (D. Minn. July 1, 2020) ("While it appears that he suffers from significant mental health disorders . . . none of these conditions have been identified by the [CDC] as specifically increasing the risk of developing serious illness from COVID-19.") (citations omitted); *United States v. Poncedeleon*, No. 18-6094, 2020 WL 3316107, at *2 (W.D.N.Y. June 18, 2020) (denying defendant's motion for compassionate release in part because "[m]ost of her medical conditions—seizures, hyperthyroidism, anxiety, bipolar disorder, depression, migraines—are not believed to present a higher risk of complications") (citations omitted).

For all of these reasons, Mr. Freedland's psychiatric conditions do not present extraordinary and compelling reasons to reduce his sentence.

### VII. Factors Under § 3553(a)

Even if the Court were to find that extraordinary and compelling circumstances warranting a reduction of Mr. Freedland's sentence exist, the Court must also then take into consideration the § 3553(a) factors. *See* 18 U.S.C. § 3582(c)(1)(A). The § 3553(a) factors caution against reducing Mr. Freedland's sentence. Mr. Freedland pleaded guilty to charges related to drug trafficking and firearm possession and the crimes underlying his convictions involved violence and intimidation against multiple individuals. Mr. Freedland's sentence appropriately reflected the severity of his offenses and furthered the goal of protecting the public from the dangers of drugs and gun violence. Furthermore, Mr. Freedland's disciplinary record while incarcerated has been far from spotless. Although Mr. Freedland disputes the light in which the Government casts his various write-ups,

he acknowledges that he has accumulated approximately 13 incident reports while incarcerated. Such a history, when added to the nature of Mr. Freedland's underlying offenses, does not instill the sort of confidence the Court requires to guarantee that Mr. Freedland's release would not pose a danger to the safety of any person or the community. Accordingly, the Court finds that Mr. Freedland has failed to meet his burden in demonstrating that the Court should reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

### CONCLUSION

For the foregoing reasons, the Court denies Mr. Freedland's motion to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). An appropriate Order follows.

BY THE COURT:

*[signature]*

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE